# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| ALISON SHERMAN, Derivatively on Behalf of CVS HEALTH CORPORATION, | ) ) ) ) | Case No. |
| Plaintiff, | ) ) | VERIFIED STOCKHOLDER DERIVATIVE |
| v. | ) ) | COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF |
| LARRY J. MERLO, DAVID M. DENTON, DAVID W. DORMAN, RICHARD J. SWIFT, C. DAVID BROWN II, JEAN-PIERRE MILLON, ANNE M. FINUCANE, TONY L. WHITE, WILLIAM C. WELDON, NANCY-ANN M. DEPARLE, RICHARD M. BRACKEN, and ALECIA A. DECOUDREAUX, | ) ) ) ) ) ) ) ) ) ) | CORPORATE ASSETS, AND UNJUST ENRICHMENT |
| Defendants, | ) ) | |
| -and- | ) | |
| CVS HEALTH CORPORATION, a Delaware corporation, | ) ) ) | |
| Nominal Defendant. | ) ) ) | |
| | ) | DEMAND FOR JURY TRIAL |

Plaintiff, by her attorneys, submits this Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge.  This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant CVS Health Corporation ("CVS" or the "Company") against certain of its officers and directors for breach of fiduciary duty, waste of corporate assets, and unjust enrichment.  These wrongs resulted in potentially hundreds of millions of dollars in damages to CVS's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed the Company to billions of dollars in potential liability for violations of state and federal law, including, among others, the federal False Claims Act ("FCA"), 31 U.S.C. §§3729-3733, various equivalent state laws, and various state consumer protection acts.

2.      CVS describes itself as "a pharmacy innovation company."  Prescription drug sales account for more than two-thirds of the Company's net retail revenues, or tens of billions of dollars annually.

3.      According to the Company's annual filings, CVS is "the only integrated pharmacy health care company with the ability to impact consumers, payors, and providers with innovative, channel-agnostic solutions to complex challenges managing costs and care."  CVS further claims to "enable people, businesses, and communities to manage health in more affordable, effective

ways."  In fact, however, for years CVS has embarked on a company-wide and countrywide scheme to artificially inflate generic prescription drug prices in order to inflate revenues. Specifically, for years CVS repeatedly and wrongfully overcharged a variety of parties, including millions of insured customers as well as a multitude of third-party payors ("Third-Party Payors" or "TPPs") such as private health insurance companies and government-funded health care programs, among others.

4.      CVS accomplished this scheme by engaging in a nearly decade-long pattern and practice of grossly misrepresenting the Company's Usual and Customary price (or "U&C," as commonly referred to in the industry) for prescription drugs.  The U&C price is generally defined as the cash price that the general public pays for a drug.  Proper U&C price reporting is crucial because various laws and regulations require that the U&C price is the *maximum amount* that pharmacies such as CVS can charge: (i) as a copay amount for insured customers; or (ii) as a reimbursement claim amount for Third-Party Payors.  In other words, by law, insured customers and Third-Party Payors should *never* pay more than the U&C cash price that the Company charges to uninsured customers.

5.      In or about 2008, CVS launched a custom-branded generic prescription drug program, which the Company called its "Health Savings Pass" ("HSP").  The HSP program allowed CVS to hide its true U&C prices, while publicly reporting inaccurate and grossly inflated U&C prices.  In particular, CVS artificially inflated its U&C prices by moving a significant amount of its cash-paying customers into the Company's HSP program, charging them steeply discounted prices, and then excluding the discounted HSP program prices in the

calculation of the Company's publicly reported U&C price.[1]   As a result, since 2008, the Company has publicly reported inflated U&C prices in order to wrongfully overcharge insured customers through excessive copay amounts and also wrongfully overcharge TPPs through excessive reimbursement claims.

6.      As a direct result of this unlawful course of conduct, the Company is now the subject of numerous lawsuits, including: (i) national and state class actions brought on behalf of insured customers that purchased prescription drugs from CVS and paid wrongfully inflated copayment prices that were greater than the Company's U&C prices; (ii) national and state class actions brought on behalf of Third-Party Payors that reimbursed CVS for prescription drugs at wrongfully inflated prices that were greater than the Company's U&C prices; and (iii) lawsuits brought by various states alleging that CVS submitted false claims for Medicaid reimbursement.

7.      The damages CVS faces are enormous.  Indeed, CVS fills or manages more than one billion prescriptions per year, generating nearly $50 billion per year in revenues.  Upon information and belief, a significant portion of that revenue is attributable to wrongful overcharges.  Worse, because the Company's repeated overcharges violated federal and state FCA statutes, the federal and state government is entitled to treble damages and a penalty of thousands of dollars in penalties for *each* of CVS's hundreds of thousands of overcharges.

8.      None of the wrongdoing described herein would have been possible without the CVS Board of Directors' (the "Board") tacit approval or willingness to turn a blind eye.  As explained herein, CVS's senior management engaged in these acts because: (i) CVS suffered a far-reaching, systemic breakdown in corporate governance spanning nearly a decade; (ii) the

---

[1] The Seventh Circuit Court of Appeals recently held that as a matter of law, the U&C price includes amounts paid through discount programs such as HSP, in the case of *United States ex rel Garbe v. Kmart Corp.*, 824 F.3d 632, 643 (7th Cir. 2016) ("*Kmart*").

Board failed to implement basic systems of internal controls over CVS's regulatory and compliance requirements; and (iii) the Board blatantly ignored repeated warnings concerning the Company's pervasive illegal practices.

9.      Plaintiff brings this action against the Individual Defendants (as defined herein) to repair the harm that they caused with their faithless actions.

<u>**JURISDICTION AND VENUE**</u>

10.      Jurisdiction is conferred by 28 U.S.C. §1332.   Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interests and costs.

11.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

12.      Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) CVS maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to CVS, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

13.     Plaintiff Alison Sherman was a stockholder of CVS at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current CVS stockholder.  Plaintiff is a citizen of Nevada.

**Nominal Defendant**

14.     Nominal defendant CVS is a Delaware corporation with principal executive offices located at One CVS Drive, Woonsocket, Rhode Island.  Accordingly, CVS is a citizen of Delaware and Rhode Island.  CVS is an integrated pharmacy health care company which operates more than 9,700 retail locations, 1,100 walk-in health care clinics, and a pharmacy benefit manager with nearly ninety million plan members.  On March 22, 2007, CVS Corporation completed a merger with Caremark Rx, Inc. and changed its name to CVS Caremark Corporation.  On September 3, 2014, CVS Caremark Corporation changed its name to CVS Health Corporation.  As of December 31, 2016, CVS employed approximately 250,000 people.

**Defendants**

15.     Defendant Larry J. Merlo ("Merlo") is CVS's Chief Executive Officer and has been since March 2011 and President and a director and has been since May 2010.  Defendant Merlo was also CVS's Chief Operating Officer from May 2010 to March 2011; President of CVS Pharmacy from January 2007 to May 2010; and Executive Vice President, Stores from April 2000 to January 2007.  Defendant Merlo knowingly, recklessly, or with gross negligence caused or allowed CVS to: (i) operate for years without adequate compliance programs to ensure proper U&C price reporting; (ii) improperly hide the Company's true U&C prices from Third-Party

Payors; and (iii) engage in rampant fraudulent prescription drug overbilling.   CVS paid defendant Merlo the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| 2016 | $1,630,000 | $3,999,931 | $3,999,990 | $7,882,000 | - | $847,456 | $18,359,377 |
| 2015 | $1,560,000 | $6,749,900 | $3,999,993 | $9,692,596 | $6,087,680 | $852,885 | $28,943,054 |
| 2014 | $1,350,000 | $6,749,996 | $3,999,998 | $11,465,052 | $8,065,273 | $720,414 | $32,350,733 |
| 2013 | $1,337,500 | $6,750,048 | $4,000,002 | $8,501,412 | $8,467,509 | $2,273,691 | $31,330,162 |
| 2012 | $1,287,500 | $6,500,004 | $3,750,001 | $6,373,092 | $2,210,254 | $209,246 | $20,330,097 |
| 2011 | $1,208,333 | $4,500,026 | $2,250,002 | $3,834,020 | $2,071,265 | $211,144 | $14,074,790 |
| 2010 | $938,889 | $5,150,031 | $1,500,001 | $1,280,000 | $1,905,802 | $131,890 | $10,906,613 |
| 2009 | $800,000 | $2,050,018 | $1,300,006 | $1,696,120 | $3,225,664 | $107,910 | $9,179,718 |
| 2008 | $775,000 | $6,862,518 | $1,250,002 | $1,501,928 | $2,483,153 | $171,640 | $13,044,241 |

Defendant Merlo is a citizen of Rhode Island.

16.     Defendant David M. Denton ("Denton") is CVS's Executive Vice President and Chief Financial Officer and has been since January 2010.  Defendant Denton was also CVS's Senior Vice President, Controller, and Chief Accounting Officer from March 2008 to December 2009; and Senior Vice President, Financial Administration from April 2007 to March 2008. Defendant Denton knowingly, recklessly, or with gross negligence caused or allowed CVS to: (i) operate for years without adequate compliance programs to ensure proper U&C price reporting; (ii) improperly hide the Company's true U&C prices from Third-Party Payors; and (iii) engage in rampant fraudulent prescription drug overbilling.  CVS paid defendant Denton the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2016 | $850,000 | $999,983 | $999,987 | $2,380,000 | $319,026 | $5,548,996 |
| 2015 | $843,750 | $1,874,937 | $874,999 | $3,077,597 | $289,298 | $6,960,581 |
| 2014 | $825,000 | $8,928,958 | $749,997 | $3,975,043 | $205,582 | $14,684,580 |
| 2013 | $793,750 | $2,125,028 | $1,375,006 | $3,430,504 | $1,004,604 | $8,728,892 |
| 2012 | $681,250 | $2,000,016 | $1,250,000 | $2,098,511 | $32,302 | $6,062,079 |
| 2011 | $606,250 | $1,750,031 | $1,000,003 | $1,168,500 | $35,942 | $4,560,726 |

| 2010 | $550,000 | $1,312,520 | $937,506 | $525,000 | $41,661 | $3,366,687 |

Defendant Denton is a citizen of Massachusetts.

17.    Defendant David W. Dorman ("Dorman") is CVS's Chairman of the Board and has been since May 2011 and a director and has been since March 2006.  Defendant Dorman knowingly or recklessly caused or allowed CVS to: (i) operate for years without adequate compliance programs to ensure proper U&C price reporting; (ii) improperly hide the Company's true U&C prices from Third-Party Payors; and (iii) engage in rampant fraudulent prescription drug overbilling.  CVS paid defendant Dorman the following compensation as a director:

| Fiscal Year | Fees Earned and Paid In Cash | Cash Fees Elected To Be Paid In Stock | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2016 | $92 | $142,408 | $427,500 | $200 | $570,200 |
| 2015 | $66 | $142,434 | $427,500 | $1,500 | $571,500 |
| 2014 | $82 | $142,418 | $427,500 | - | $570,000 |
| 2013 | $44 | $114,956 | $345,000 | - | $460,000 |
| 2012 | $44 | $114,956 | $345,000 | - | $460,000 |
| 2011 | $47 | $114,953 | $345,000 | - | $460,000 |
| 2010 | $46 | $67,454 | $202,500 | - | $270,000 |
| 2009 | $17 | $67,483 | $202,500 | - | $270,000 |
| 2008 | - | $79,478 | $368,620 | - | $448,098 |

Defendant Dorman is a citizen of Florida.

18.    Defendant Richard J. Swift ("Swift") is a CVS director and has been since September 2006.  Defendant Swift is the Chairman of CVS's Audit Committee and has been since at least March 2011, and a member of that committee and has been since at least April 2007.  Defendant Swift knowingly or recklessly caused or allowed CVS to: (i) operate for years without adequate compliance programs to ensure proper U&C price reporting; (ii) improperly hide the Company's true U&C prices from Third-Party Payors; and (iii) engage in rampant fraudulent prescription drug overbilling.  CVS paid defendant Swift the following compensation as a director:

- 7 -

| Fiscal Year | Fees Earned and Paid In Cash | Cash Fees Elected To Be Paid In Stock | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2016 | $76,347 | - | $228,653 | $2,056 | $307,056 |
| 2015 | $76,250 | - | $228,750 | $3,366 | $308,366 |
| 2014 | $76,250 | - | $228,750 | $1,866 | $306,866 |
| 2013 | $71,250 | - | $213,750 | $1,790 | $286,790 |
| 2012 | $70,000 | - | $210,000 | $1,658 | $281,658 |
| 2011 | $70,024 | - | $209,976 | $1,627 | $281,627 |
| 2010 | - | $65,000 | $195,000 | $1,677 | $261,677 |
| 2009 | - | $65,000 | $195,000 | $867 | $260,867 |
| 2008 | $75,000 | - | $361,120 | - | $436,120 |

Defendant Swift is a citizen of New Jersey.

19.     Defendant C. David Brown II ("Brown") is a CVS director and has been since March 2007.  Defendant Brown knowingly or recklessly caused or allowed CVS to: (i) operate for years without adequate compliance programs to ensure proper U&C price reporting; (ii) improperly hide the Company's true U&C prices from Third-Party Payors; and (iii) engage in rampant fraudulent prescription drug overbilling.  CVS paid defendant Brown the following compensation as a director:

| Fiscal Year | Fees Earned and Paid In Cash | Cash Fees Elected To Be Paid In Stock | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2016 | - | $75,000 | $225,000 | $2,056 | $302,056 |
| 2015 | - | $75,000 | $225,000 | $1,866 | $301,866 |
| 2014 | $0 | $75,000 | $225,000 | $1,866 | $301,866 |
| 2013 | $0 | $70,000 | $210,000 | $1,790 | $281,790 |
| 2012 | $60 | $67,440 | $202,500 | $1,658 | $271,658 |
| 2011 | $40 | $67,460 | $202,500 | $1,627 | $271,627 |
| 2010 | - | $65,000 | $195,000 | $1,677 | $261,677 |
| 2009 | - | $65,000 | $195,000 | $1,538 | $261,538 |
| 2008 | - | $76,754 | $361,120 | $2,462 | $440,336 |

Defendant Brown is a citizen of Florida.

20.     Defendant Jean-Pierre Millon ("Millon") is a CVS director and has been since March 2007.  Defendant Millon is a member of CVS's Audit Committee and has been since at least March 2011, and also a member of CVS's Patient Safety and Clinical Quality Committee

and has been since March 2016.  Defendant Millon knowingly or recklessly caused or allowed CVS to: (i) operate for years without adequate compliance programs to ensure proper U&C price reporting; (ii) improperly hide the Company's true U&C prices from Third-Party Payors; and (iii) engage in rampant fraudulent prescription drug overbilling.  CVS paid defendant Millon the following compensation as a director:

| Fiscal Year | Fees Earned and Paid In Cash | Cash Fees Elected To Be Paid In Stock | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2016 | $70,075 | - | $209,925 | $2,056 | $282,056 |
| 2015 | $70,129 | - | $209,871 | $3,366 | $283,366 |
| 2014 | $70,010 | - | $209,990 | $1,866 | $281,866 |
| 2013 | $65,089 | - | $194,911 | $1,790 | $261,790 |
| 2012 | $65,087 | - | $194,913 | $1,658 | $261,658 |
| 2011 | $65,027 | - | $194,973 | $946 | $260,946 |
| 2010 | $65,025 | - | $194,975 | - | $260,000 |
| 2009 | $23 | $64,977 | $195,000 | - | $260,000 |
| 2008 | - | $73,828 | $361,120 | - | $434,948 |

Defendant Millon is a citizen of Arizona.

21.    Defendant Anne M. Finucane ("Finucane") is a CVS director and has been since January 2011.  Defendant Finucane knowingly or recklessly caused or allowed CVS to: (i) operate for years without adequate compliance programs to ensure proper U&C price reporting; (ii) improperly hide the Company's true U&C prices from Third-Party Payors; and (iii) engage in rampant fraudulent prescription drug overbilling.  CVS paid defendant Finucane the following compensation as a director:

| Fiscal Year | Fees Earned and Paid In Cash | Cash Fees Elected To Be Paid In Stock | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2016 | $70,075 | - | $209,925 | - | $280,000 |
| 2015 | $6 | $69,994 | $210,000 | $1,111 | $281,111 |
| 2014 | $70,000 | - | $210,000 | $2,666 | $282,666 |
| 2013 | $65,089 | - | $194,911 | $2,557 | $262,557 |
| 2012 | $65,087 | - | $194,913 | $1,982 | $261,982 |
| 2011 | $37,952 | $48,750 | $259,965 | - | $346,667 |

Defendant Finucane is a citizen of Massachusetts.

22.     Defendant Tony L. White ("White") is a CVS director and has been since March 2011.   Defendant White is also a member of CVS's Patient Safety and Clinical Quality Committee and has been since March 2016, and was a member of CVS's Audit Committee from at least March 2014 to at least March 2015.   Defendant White knowingly or recklessly caused or allowed CVS to: (i) operate for years without adequate compliance programs to ensure proper U&C price reporting; (ii) improperly hide the Company's true U&C prices from Third-Party Payors; and (iii) engage in rampant fraudulent prescription drug overbilling.   CVS paid defendant White the following compensation as a director:

| Fiscal Year | Fees Earned and Paid In Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | $70,075 | $209,925 | $2,056 | $282,056 |
| 2015 | $70,129 | $209,871 | $2,866 | $282,866 |
| 2014 | $70,010 | $209,990 | - | $280,000 |
| 2013 | $65,089 | $194,911 | $630 | $260,630 |
| 2012 | $65,087 | $194,913 | $789 | $260,789 |
| 2011 | $75,891 | $227,442 | $322 | $303,655 |

Defendant White is a citizen of Georgia.

23.     Defendant William C. Weldon ("Weldon") is a CVS director and has been since March 2013.   Defendant Weldon knowingly or recklessly caused or allowed CVS to: (i) operate for years without adequate compliance programs to ensure proper U&C price reporting; (ii) improperly hide the Company's true U&C prices from Third-Party Payors; and (iii) engage in rampant fraudulent prescription drug overbilling.   CVS paid defendant Weldon the following compensation as a director:

| Fiscal Year | Fees Earned and Paid In Cash | Cash Fees Elected To Be Paid In Stock | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2016 | - | $70,000 | $210,000 | $200 | $280,200 |
| 2015 | - | $70,000 | $210,000 | $1,500 | $281,500 |
| 2014 | $20,000 | $70,000 | $210,000 | - | $300,000 |

| 2013 | $75,834 | - | $227,499 | - | $303,333 |

Defendant Weldon is a citizen of Florida.

24.     Defendant Nancy-Ann M. DeParle ("DeParle") is a CVS director and has been since September 2013.  Defendant DeParle is a member of CVS's Audit Committee and has been since September 2013, and a member of CVS's Patient Safety and Clinical Quality Committee and has been since March 2016.  Defendant DeParle knowingly or recklessly caused or allowed CVS to: (i) operate for years without adequate compliance programs to ensure proper U&C price reporting; (ii) improperly hide the Company's true U&C prices from Third-Party Payors; and (iii) engage in rampant fraudulent prescription drug overbilling.  CVS paid defendant DeParle the following compensation as a director:

| Fiscal Year | Fees Earned and Paid In Cash | Cash Fees Elected To Be Paid In Stock | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2016 | $70,075 | - | $209,925 | $200 | $280,200 |
| 2015 | $70,103 | - | $209,897 | - | $280,000 |
| 2014 | $54,536 | $61,249 | $183,746 | - | $299,531 |
| 2013 | $27,128 | $16,250 | $129,955 | - | $173,333 |

Defendant DeParle is a citizen of Maryland.

25.     Defendant Richard M. Bracken ("Bracken") is a CVS director and has been since January 2015.  Defendant Bracken is the Chairman of CVS's Patient Safety and Clinical Quality Committee and has been since March 2016, and was also a member of CVS's Audit Committee from March 2015 to March 2016.   Defendant Bracken knowingly or recklessly caused or allowed CVS to: (i) operate for years without adequate compliance programs to ensure proper U&C price reporting; (ii) improperly hide the Company's true U&C prices from Third-Party Payors; and (iii) engage in rampant fraudulent prescription drug overbilling.   CVS paid defendant Bracken the following compensation as a director:

| Fiscal Year | Fees Earned and Paid In Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | $74,524 | $222,976 | $200 | $297,700 |
| 2015 | $93,514 | $279,819 | $1,500 | $374,833 |

Defendant Bracken is a citizen of Tennessee.

26.     Defendant Alecia A. DeCoudreaux ("DeCoudreaux") is a CVS director and has been since March 2015.  Defendant DeCoudreaux is a member of both CVS's Audit Committee and its Patient Safety and Clinical Quality Committee and has been since at least April 2016.  Defendant DeCoudreaux knowingly or recklessly caused or allowed CVS to: (i) operate for years without adequate compliance programs to ensure proper U&C price reporting; (ii) improperly hide the Company's true U&C prices from Third-Party Payors; and (iii) engage in rampant fraudulent prescription drug overbilling.   CVS paid defendant DeCoudreaux the following compensation as a director:

| Fiscal Year | Cash Fees Elected To Be Paid In Stock | Stock Awards | Total |
|---|---|---|---|
| 2016 | $70,000 | $210,000 | $280,200 |
| 2015 | $81,667 | $245,000 | $326,667 |

Defendant DeCoudreaux is a citizen of Massachusetts.

27.     The defendants identified in ¶¶15-16 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶15, 17-26 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶18, 20, 22, 24-26 are referred to herein as the "Audit Committee Defendants."  Collectively, the defendants identified in ¶¶15-26 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

28.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe CVS and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage CVS in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of CVS and not in furtherance of their personal interest or benefit.

29.     To discharge their duties, the officers and directors of CVS were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of CVS were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and refrain from engaging in deceptive or fraudulent conduct;

(c)     ensure processes were in place for maintaining the integrity and reputation of the Company and reinforcing a culture of ethics, compliance, and appropriate risk management;

(d)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(e)      remain informed as to how CVS conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(f)      truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Additional Duties of the Audit Committee Defendants**

30.      In addition to these duties, under its Charter in effect since at least 2005, the Audit Committee Defendants, defendants Swift, Millon, White, DeParle, Bracken, and DeCoudreaux, owed specific duties to CVS to assist the Board in overseeing "compliance by the Company with legal and regulatory requirements."   Moreover, the Audit Committee's Charter provides that "Audit Committee shall review the Company's policies and practices with respect to risk assessment and risk management, including discussing with management the Company's major financial risk exposures and the steps that have been taken to monitor and control such exposures."

**Breaches of Duties**

31.      Each Individual Defendant, by virtue of his or her position as an officer and/or director, owed to the Company the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of CVS, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not

being aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised all of CVS's Board during the time of the misconduct.

32.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to engage in improper practices that perpetrated billions of dollars of fraud on the Company's customers, Third-Party Payors, and the government, and caused CVS to incur substantial damage.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

33.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

34.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that: (i) deceived and exploited the Company's customers, Third-Party Payors, and the government by falsely reporting its U&C prices on hundreds of thousands of occasions; and (ii) enhanced their executive and directorial positions at CVS and the profits, power, and prestige that they enjoyed as a result of holding these positions. The Individual Defendants, collectively and individually, took the actions set forth herein.

35.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations.

36.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly defraud the government for over a decade.   Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

37.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.   In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## OVERVIEW OF CVS'S BUSINESS AND REGULATED PRESCRIPTION PRICING STANDARDS

38.     CVS is one of the largest prescription drug retailers in the United States.   More than two-thirds of the Company's net retail revenues are attributable to prescription drug sales, amounting to tens of billions of dollars annually.   The Company is also one of the largest

pharmacy benefit managers, or PBMs, in the United States.[2]  As a PBM, the Company and its fiduciaries are acutely aware of drug pricing and related rules and regulations.

39.     Approximately 90% of all United States citizens have either a public or private health care plan.  Through these plans, a Third-Party Payor (such as a private insurance company, Medicare, or Medicaid) covers all or a portion of the covered individual's pharmaceutical prescription expenses and the beneficiary typically pays a copayment directly to the pharmacy.  Even though plan participants cannot and do not negotiate the price charged by pharmacies such as CVS for prescription drugs, and further, do not negotiate the copayment price for the drug in any given transaction, they are required to pay to CVS a copayment amount in order to receive the prescription.

40.     Pursuant to the National Council for Prescription Drug Programs ("NCPDP") reporting standards, CVS is required to report its U&C prices to Third-Party Payors for each prescription transaction.[3]  The copayment amount and Third-Party Payor reimbursement amount are both based on the drug price information provided by CVS, particularly with respect to the Company's U&C prices.

_____

[2] A PBM is a third-party administrator of prescription drug programs for commercial health plans, self-insured employer plans, Medicare Part D plans, the Federal Employees Health Benefits Program, and state government employee plans.

[3] NCPDP is a not-for-profit standards development organization with over 1,575 members representing most sectors of the pharmacy services industry.  Congress has codified and adopted the NCPDP standards through federal legislation, including Health Insurance Portability and Accountability Act ("HIPAA"), Medicare Modernization Act, Health Information Technology for Economic and Clinical Health, and Meaningful Use.  For example, HIPAA requires uniform methods and codes for exchanging electronic information with health insurance plans.  These standards are referred to as the NCPDP Telecommunications Standard.  HIPAA also requires prescribers follow the NCPDP SCRIPT Standards when prescribing drugs under Medicare Part D.  CVS has long used the industry standard NCPDP reporting for electronic transmission and adjudication of its pharmacy claims.

41.     NCPDP provides a standardized form for CVS pharmacies to fill out and send to Third-Party Payors when filing prescriptions.  The form includes Field No. 426-DQ, where CVS is required to report its "usual and customary" price of the prescription being filled.  NCPDP defines the term "usual and customary" as the "[a]mount charged cash customers for the prescription exclusive of sales tax or other amounts claimed."  Similarly, Medicare and Medicaid programs also define the U&C price as the amount charged to cash customers and also require CVS to report its U&C prices for each prescription transaction.  The Seventh Circuit also recently confirmed that that the "usual and customary" price is defined as the "cash price offered to the general public." *Kmart*, 824 F. 3d at 643.

42.     Importantly, CVS cannot charge copays to customers or seek reimbursements from Third-Party Payors that are higher than the Company's U&C prices.  In other words, the U&C price is the ***maximum*** amount CVS can charge for a copayment and the maximum amount CVS can seek in Third-Party Payor reimbursement.  Further, as stated by the Seventh Circuit, the "'usual and customary' price requirement should not be frustrated by so flimsy a device as [a pharmacy's] 'discount programs.'"  *Kmart*, 824 F. 3d at 645.

43.     CVS and its fiduciaries are intimately familiar with both the definition of "usual and customary," as well as how the U&C price of a particular prescription drug is ascertained and reported.  Indeed, as one of the largest PBMs in the United States, CVS operates as a middleman to help determine how medicines are priced, and the Company regularly negotiates drug pricing between drug makers, pharmacies, and health insurers.  U&C prices are a critical component used in establishing the pricing that PBMs will use to invoice clients, and CVS deals extensively with these issues as a PBM.

44.     As detailed below, despite the above noted unambiguous requirements and despite the Company's intimate knowledge of U&C pricing requirements, for nearly a decade the Board utterly failed to implement adequate internal controls to ensure the Company's proper U&C reporting and compliance with various rules and regulations.  Instead, the Board fostered a culture of lawlessness that promoted wrongful prescription drug overcharges and, after receiving repeated notice of the illegal practice, failed to implement adequate controls to prevent further abuse.

## CVS IMPLEMENTS THE HSP PROGRAM TO UNLAWFULLY HIDE ITS TRUE U&C PRICES

45.     In 2006, large "big box" retailers with pharmacy departments began offering hundreds of generic prescription drugs at significantly reduced prices.  For example, in 2006, Wal-Mart Stores, Inc. ("Wal-Mart") and Target Corporation ("Target") both began charging $4 for a thirty-day supply and $10 for a ninety-day supply of the most commonly prescribed generic drugs.   Other retailers with pharmacy departments soon followed suit, including Costco Wholesale Corporation ("Costco").  On information and belief, Wal-Mart, Target, and Costco all report their discounted prices as their U&C prices to Third-Party Payors.

46.     In or about 2008, to combat this sea of change, CVS created a custom-branded loyalty program targeted at the Company's cash customers.  This program, called the Health Savings Plan or HSP, is a discount prescription drug program which CVS uses to offer savings on approximately 400 of the most commonly prescribed generic medications.  The in-house HSP program is not a third-party plan, not insurance, and not intended to be a substitute for insurance.  Rather, the HSP program has always been open to any and all of the Company's cash-paying customers.  From its inception until about 2010, customers could enroll in the HSP program for $10, and thereafter the price was increased to $15.

47.     Through the HSP program, CVS split its cash-paying customer base into two categories: (i) customers who paid the purported retail price for drugs; and (ii) customers who paid the significantly discounted HSP price.   Uninsured customers quickly flocked to the HSP program and HSP customers soon accounted for a majority of the Company's cash-paying customers.   Given that the U&C price is defined as the cash price offered to the general public, the HSP price, which is the price paid by a majority of CVS's cash-paying customers, is the true U&C price for CVS's prescription drug sales.

48.     On information and belief, since about 2008, there have been millions of instances where CVS intentionally submitted its inflated non-HSP retail prices as its purported U&C price to Third-Party Payors such as private insurance companies, Medicare, and Medicaid.   The non-HSP retail prices, however, are substantially higher than the true U&C prices that the Company offers to the general public through the HSP program.   Indeed, CVS has reported U&C prices to Third-Party Payors that are up to seven times higher than its HSP prices, and up to nine times higher than the U&C prices reported by several of the Company's competitors such as Wal-Mart, Target, and Costco.

49.     CVS's scheme is made possible because Third-Party Payors are not privy to the prices CVS charges its cash-paying customers, including those using the HSP program to purchase its prescription generic drugs.   Thus, Third-Party Payors have no way of determining on their own whether the price CVS submits as its "usual and customary" price is actually the price offered to cash-paying members of the general public, and therefore, are unaware that the price being submitted by CVS is not the actual "usual and customary" price, but rather an artificially inflated amount.

**THE BOARD WAS REPEATEDLY WARNED ABOUT THE COMPANY'S
ILLEGAL MULTI-YEAR SCHEME, BUT BRAZENLY ALLOWED
THE PRACTICE TO CONTINUE**

50.     By no later than 2012, the Company was notified that CVS's failure to report its discounted HSP price as the U&C price was improper.  In February 2012, the Attorney General of the State of Texas issued Civil Investigative Demands and thereafter issued a series of subsequent requests for documents and information in connection with its still pending investigation concerning the HSP program and other pricing practices with respect to claims for reimbursement from the Texas Medicaid program.  Thereafter, the State of Texas filed a petition, which remains pending.  The petition alleges that CVS violated the Texas Medicaid Fraud Prevention Act by submitting false claims for reimbursement to Texas Medicaid by, among other things, failing to use the price available to members of the CVS HSP program as the U&C price.  This action was not publicly disclosed until January 2017 when the court unsealed a first amended petition.  Nonetheless, upon information and belief, the Board was made aware of the claims in 2012 given the Board's principal duty of ensuring that the Company operates in compliance with all applicable laws and regulations.  In any event, the Board was indisputably notified of the investigation by no later than February 10, 2015, when the investigation was disclosed in the Company's 2014 Annual Report on Form 10-K, filed with the SEC.  The filing was signed by the Company's Chief Financial Officer, defendant Denton, as well as all of the Company's then-current Board members, including defendants Bracken, Brown, DeParle, Dorman, Finucane, Merlo, Millon, Swift, Weldon, and White.  The Form 10-K stated, in relevant part that "the Attorney General of the State of Texas has issued civil investigative demands and other requests in February 2012 and May 2014, and has continued its investigation concerning the Health Savings Pass program and claims for reimbursement from the Texas Medicaid program."  As detailed below, several additional actions against the Company concerning its

illegal billing scheme were filed in the following years and disclosed to the Board, including disclosures in the Company's public filings with the SEC that were signed by these defendants.

51.     The Board continued to receive repeated notifications of CVS's improper billing practices.  Indeed, beginning in or about July 2015, CVS customers and Third-Party Payors started filing numerous state and federal class actions seeking damages and to enjoin CVS's illegal practices and recover the Company's ill-gotten gains.  Despite these repeated red flags that were waved in the Board's face, however, the Director Defendants continued to allow the Company's illegal practices to continue unabated.

52.     In particular, in July and September 2015, respectively, consumers filed class actions against CVS in the U.S. District Court for the Northern District of California and the U.S. District Court for the Northern District of Illinois.  These actions, which were thereafter consolidated in U.S. District Court for the Northern District of California, detail the Company's illegal scheme to overcharge for copayments through inflated U&C reporting and seek damages and injunctive relief on behalf of consumers who purchased certain prescription drugs under the consumer protection statutes and common laws of various states.  CVS first disclosed these consumer class actions in the Company's Quarterly Report on Form 10-Q filed with the SEC on October 30, 2015, signed by defendant Denton, and then again in the Company's 2015 Annual Report on Form 10-K filed with the SEC on February 9, 2016, signed by defendants Denton, Bracken, Brown, DeCoudreaux, DeParle, Dorman, Finucane, Merlo, Millon, Swift, Weldon, and White.  On July 29, 2016, the U.S. District Court denied the Company's motion to dismiss certain claims, including claims arising under the Texas Deceptive Trade Practices Act.  In its ruling, the U.S. District Court found that the consumer plaintiffs adequately alleged that CVS engaged in an "unlawful practice" by reporting the inflated U&C prices, and that the Company's

actions "resulted in 'unfairness [that] was glaringly noticeable, flagrant, complete and unmitigated.'" Nevertheless, the Company's illegal practices persisted.

53.     In February and August 2016, several Third-Party Payors filed class actions against CVS on behalf of payors in the U.S. District Court for the District of Rhode Island, all of which remain pending. As disclosed by the Company in its Quarterly Report on Form 10-Q filed with the SEC on May 3, 2016, signed by defendant Denton, and again in CVS's 2016 Annual Report on Form 10-K, filed with the SEC on February 9, 2017, signed by defendants Denton, Bracken, Brown, DeCoudreaux, DeParle, Dorman, Merlo, Millon, Swift, Weldon, and White, these actions are "similar" to the above-noted consumer class actions. Indeed, like the consumer class actions, these Third-Party Payor class actions detail the Company's illicit scheme and allege that the Company overcharged for certain prescription drugs by not submitting as the pharmacy's U&C price the price available to members of the CVS HSP program. On November 1, 2016, the U.S. District Court denied CVS's motion to dismiss (without prejudice) one of the Third-Party Payor class actions, styled *Sheet Metal Workers Local No. 20 Welfare and Benefit Fund v. CVS Health Corp.*, No. 16-046-S. The U.S. District Court found that the Third-Party Payors: (i) adequately alleged claims against CVS for fraud, negligent misrepresentation, unjust enrichment; (ii) that the plaintiffs adequately stated a claim under Indiana's Deceptive Consumer Sales Act; and (iii) that the named plaintiffs, who are Indiana TPPs, have standing to assert state law claims on behalf of class members from other states.

54.     In April 2016, the Superior Court of the State of California, County of Sacramento, unsealed a first amended *qui tam* complaint filed in July 2013, which similarly alleges that CVS submitted false claims for payment to California Medicaid in connection with reimbursement for drugs available through the HSP program as well as certain other generic

drugs.   As detailed in the complaint, California Welfare and Institutions Code section 14105.45(b) specifically limits the amount CVS can charge Medi-Cal for prescription medication, stating that such charges "shall not exceed … [CVS's] usual and customary charge," which is defined as the "lower of … (1) [t]he lowest price reimbursed to [CVS] by other third party payors…" or "(2) [t]he lowest price routinely offered to any segment of the general public." Despite these requirements, "CVS has repeatedly scammed the Medi-Cal program … by submitting false Medi-Cal Usual and Customary Rates Reports, which do not accurately reflect its discounted cash prices [as offered through the HSP program]."   The complaint seeks treble damages and penalties of up to $11,000 per false claim.   Although the government declined to intervene in this action, on October 13, 2016, the Company's motion to dismiss the complaint was denied and the case remains pending.   The Superior Court noted that the *qui tam* whistleblower plaintiff, an expert pharmacist that administered California's Medi-Cal program, had independently "compiled specific facts and evidence showing that CVS knowingly billed Medi-Cal in excess of its usual and customary rates ... and failed to dispense the lowest cost drug available when filling prescriptions for Medi-Cal beneficiaries."   The complaint was first disclosed by the Company in its Quarterly Report on Form 10-Q filed with the SEC on November 8, 2016, signed by defendant Denton, and again noted in the 2016 Annual Report on Form 10-K filed with the SEC on February 9, 2017, signed by defendants Denton, Bracken, Brown, DeCoudreaux, DeParle, Dorman, Merlo, Millon, Swift, Weldon, and White.

55.   According to the Company's November 8, 2016 Form 10-Q, signed by defendant Denton, in July 2016, the State of Mississippi filed a complaint alleging that CVS retail pharmacies submitted false claims for reimbursement to Mississippi Medicaid by not submitting as the pharmacy's U&C price the price available to members of the CVS HSP program.   The

- 24 -

same disclosure appears in CVS's February 9, 2017 Form 10-K, signed by defendants Denton, Bracken, Brown, DeCoudreaux, DeParle, Dorman, Merlo, Millon, Swift, Weldon, and White. This case remains pending.

56.     In addition to the above, CVS and the Individual Defendants also received repeated warnings of the Company's illegal practices as a result of similar cases that were filed against some of CVS's competitors that implemented substantially similar illegal schemes.  For example, in or about 2012, a *qui tam* complaint alleging FCA violations against Kmart Corporation ("Kmart") was unsealed.  That complaint alleged that Kmart charged significantly lower prices to customers in its "discount programs," and the discount program sales were wrongfully ignored when Kmart calculated its U&C prices for its generic drugs for purposes of Medicare reimbursement.  As noted above, on May 27, 2016, the Seventh Circuit found that the "usual and customary" price is defined as the "cash price offered to the general public," and further explained that the "'usual and customary' price requirement should not be frustrated by so flimsy a device as [a pharmacy's] 'discount programs.'"  *Kmart*, 824 F. 3d at 645.  Similar cases have also been filed against several of CVS's other competitors, including Walgreens Boots Alliance Inc. and Rite Aid Corporation.  Given the striking similarity shared between all of these schemes to report excessive U&C prices, the Board had a particular duty to pay close attention to these cases and to ensure that CVS did not similarly violate relevant laws and regulations.

57.     Despite the above-repeated warnings of the Company's illegal scheme, the Board utterly failed to implement controls to ensure the wrongful practice subsided.  In fact, although the Company finally discontinued the HSP program in or about April 2017, CVS merely moved the program's members to new discount programs, including the Company's Reduced Rx[TM] prescription savings program, launched in March 2017, and its Cigna Health Works[SM] program,

launched in June 2017. Through these programs, CVS continues to offer discounted prescription drugs and, upon information and belief, continues to exclude the Company's discounted prices from its U&C price reporting. As a result of the Board's wrongful conduct, CVS continues to wrongfully report inflated U&C prices, customers and Third-Party Payors continue to be illegally overcharged, and the Company remains exposed to significant current and future liability.

## DAMAGES TO CVS

58.     As a result of the Individual Defendants' improprieties, CVS illegally overcharged its customers and Third-Party Payors for prescription drugs for nearly a decade. The Company is now potentially liable for billions of dollars in damages, including treble damages for violations of various false claims statutes and thousands of dollars in penalties for each and every time the Company submitted false claims.

59.     CVS's illegal practices and gross failures to timely address and remedy such practices also severely damaged its reputation with its largest customers, including numerous Third-Party Payors and federal and state governments. Given the Company's longstanding failure to prevent fraud, curb known abuses, and implement adequate controls to ensure illegal practices are timely discovered and properly addressed, the government may revoke certain licenses from CVS or exclude the Company from participation in government programs. CVS's revenue sources are now impaired.

60.     Further, as a direct and proximate result of the Individual Defendants' actions, CVS has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a)      costs incurred from defending and paying any settlement or judgment in the numerous pending actions against the Company; and

(b)      costs incurred from compensation and benefits paid to the defendants who have breached their duties to CVS.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

61.      Plaintiff brings this action derivatively in the right and for the benefit of CVS to redress injuries suffered, and to be suffered, by CVS as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.   CVS is named as a nominal defendant solely in a derivative capacity.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

62.      Plaintiff will adequately and fairly represent the interests of CVS in enforcing and prosecuting its rights.

63.      Plaintiff was a stockholder of CVS at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current CVS stockholder.

64.      The current Board of CVS consists of the following twelve individuals: defendants Merlo, Dorman, Swift, Brown, Millon, Finucane, White, Weldon, DeParle, Bracken, and DeCoudreaux, and non-defendant Mary L. Schapiro.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Merlo, Dorman, Swift, Brown, Millon, Finucane, White, Weldon, DeParle, Bracken, and DeCoudreaux Face a Substantial Likelihood of Liability for Their Misconduct**

65.      The principal duty of the Board is to ensure that the Company operates in compliance with all applicable laws and regulations.  Defendants Merlo, Dorman, Swift, Brown,

Millon, Finucane, White, Weldon, DeParle, Bracken, and DeCoudreaux face a substantial likelihood of liability for repeatedly failing to comply with this duty.

66.     For years, Director Defendants Merlo, Dorman, Swift, Brown, Millon, Finucane, White, Weldon, DeParle, Bracken, and DeCoudreaux knowingly failed to implement an effective compliance program, including by failing to implement measures that prevent, detect, and correct noncompliance with U&C price reporting requirements as well as measures that prevent, detect, and correct fraud, waste, and abuse.  In fact, as discussed above, despite knowing about the improprieties for years, the Board failed to implement measures to prevent the illegal overbilling.  Further, although CVS finally discontinued the HSP program in February 2017, the Board caused or allowed the Company to simply shift the discounts into other programs and continue to fail to report proper U&C prices.

67.     Plaintiff has not made any demand on CVS stockholders to institute this action since such a demand would be a futile and useless act for the following reasons:

a)      CVS is a publicly traded company with over one billion shares outstanding and thousands of stockholders;

b)      Making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of stockholders; and

c)      Making demand on all stockholders would force plaintiff to incur huge expenses, assuming all stockholders could be individually identified.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

68.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

69.     The Individual Defendants owed and owe CVS fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe CVS the highest obligation of good faith, fair dealing, loyalty, and due care.

70.     The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within CVS, and/or consciously failing to prevent the Company from engaging for nearly a decade in the unlawful acts complained of herein.

71.     The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) CVS was required report accurate U&C prices to Third-Party Payors; (ii) CVS reported grossly inflated U&C prices to Third-Party Payors for nearly a decade; (iii) CVS engaged in rampant fraudulent overbilling to customers and Third-Party Payors for nearly a decade.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

72.     Director Defendants, as directors of the Company, owed CVS the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly permitting the improper activity to continue for over a decade.  The Director Defendants knew or were reckless in not knowing that:  (i) CVS was required report accurate U&C prices to Third-Party Payors; (ii) CVS

- 29 -

reported grossly inflated U&C prices to Third-Party Payors for nearly a decade; (iii) CVS engaged in rampant fraudulent overbilling to customers and Third-Party Payors for nearly a decade.  Accordingly, the Director Defendants breached their duty of loyalty to the Company.

73.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, CVS has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

74.    Plaintiff, on behalf of CVS, has no adequate remedy at law.

**COUNT II**

**Against the Individual Defendants for Waste of Corporate Assets**

75.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

76.    As a result of the wrongdoing detailed herein and by failing to conduct proper supervision, the Individual Defendants have caused CVS to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

77.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

78.    Plaintiff, on behalf of CVS, has no adequate remedy at law.

**COUNT III**

**Against the Individual Defendants for Unjust Enrichment**

79.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

- 30 -

80.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of CVS.   The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to CVS.

81.     Plaintiff, as a stockholder and representative of CVS, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

82.     Plaintiff, on behalf of CVS, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of CVS, demands judgment as follows:

A.     Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.     Directing CVS to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect CVS and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following Corporate Governance Policies:

1.     a proposal to strengthen Board oversight and supervision of CVS's U&C price reporting practices;

2.      a proposal to strengthen Board oversight and supervision of CVS's prescription drug billing practices;

3.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

4.      a provision to permit the stockholders of CVS to nominate at least three candidates for election to the Board;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of CVS has an effective remedy;

D.      Awarding to CVS restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: August 16, 2017                    MOORE, VIRGADAMO & LYNCH, LTD.


                                          /s/ Jeremiah C. Lynch, III

                                          Jeremiah C. Lynch, III #3968
                                          Moore, Virgadamo & Lynch, Ltd.
                                          97 John Clarke Road
                                          Middletown, RI 02842
                                          Telephone: (401) 846-0120
                                          Facsimile: (410) 848-0234
                                          E-mail: jlynch@mvllaw.com

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
GEORGE C. AGUILAR
STEVEN M. MCKANY
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
        gaguilar@robbinsarroyo.com
        smckany@robbinsarroyo.com

Attorneys for Plaintiff

1202553

## VERIFICATION

I, Alison Sherman, hereby declare as follows:

I am the plaintiff in the within entitled action.  I have read the Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated:  8/12/17

ALISON SHERMAN